# FLORIDA NATIONAL BANK v NEB OF WPB NO. 1, INC., et al.
## Case No. CL 89-6543 AJ
Fifteenth Judicial Circuit, Palm Beach County
September 18, 1990

### APPEARANCES OF COUNSEL

Herbert C. Gibson, Esquire and Kathleen Loggins, Esquire, for plaintiff.

Margaret L. Cooper, Esquire, for defendant, River Bridge Corporation.

Mark F. Bideau, Esquire and Thomas E. Kingcade, Esquire, for defendants, NEB of WPB No. 1, Inc., RMS River Bridge No. 1, Inc., both individually and as general partners of The Landings Associates.

Mark Bideau, Esquire, for defendants, Elinor Kids Realty, Inc. and M. A. Bruder & Sons, Inc.

Jack Brolsma and Joyce Brolsma, pro se.

## OPINION OF THE COURT

MARY E. LUPO, Circuit Judge.

### *FINAL JUDGMENT FOR PLAINTIFF*

This case came before the court for non-jury trial on August 20, 21, 22 and 23, 1990. Herbert C. Gibson, Esq. and Kathleen J. Loggins, attorney, represent the plaintiff. Mark Bideau, Esq. and Thomas E. Kingcade, Esq. represent NEB of WPB No. 1, Inc., RMS River Bridge No. 1, Inc., both individually and as general partners of The Landings Associates. Mark Bideau, Esq. represents Elinor Kids Realty, Inc. and M. A. Bruder & Sons, Inc. Jack M. Brolsma and Joyce J. Brolsma represent themselves. Margaret Cooper, attorney, represents River Bridge Corporation.

The court heard testimony from Stephen Skakandy, Lowell Bower, Joyce Brolsma, Jack Brolsma, Calvin Cearley, Sanford Burns, Norman Belfer, Frank Briscoe and Richard Zaretsky.

The Bank introduced 87 exhibits in evidence, the corporate defendants 95 exhibits and the Brolsmas two exhibits.

Stipulations among the parties are of record.

The case proceeded to trial on the Bank's six-count complaint (D.E. 1) and the defendants' answers. The corporate defendants took a voluntary dismissal without prejudice of their counterclaim.

The court makes the following findings of fact:

1. The Landings Associates was created by a partnership agreement dated November 15, 1985. The purpose of the partnership was to acquire unimproved POD 1-B within River Bridge PUD (known as The Landings) and to construct 112 townhouse homes within POD 1-B. The partnership is composed of three corporations: Brolsma Homes, Inc., NEB of WPB No. 1, Inc. and RMS River Bridge No. 1, Inc. NEB and RMS were created solely for the purpose of the acquisition and development of the Landings property. The sole asset of NEB and RMS is their partnership interest in The Landings Associates. Jack Brolsma, the contractor for The Landings, is the principal of Brolsma Homes; Norman Belfer is the principal of NEB; Sanford Burns is the principal of RMS.

2. On June 4, 1985, Brolsma Homes entered into a Selected Builder's Agreement with River Bridge Corporation designating Brolsma Homes as the selected builder to develop 112 units in six phases (POD 1-B). The agreement provides purchase options permitting Brolsma to purchase all six phases at The Landings. The agreement was assigned by

**175**

Brolsma Homes to the partnership on November 19, 1985; the partnership purchased the first of the six phases on November 19, 1985.

3. Jack Brolsma and Richard Zaretsky negotiated a commitment letter with the Bank. The commitment letter, dated February 24, 1986, was executed by The Landings Associates, as "Borrower". The stated purpose of the commitment letter is:

Bank is issuing to Borrower a revolving line of credit to finance the development and construction of the Project which shall consist of a total of 112 units developed and constructed in six phases. Further, funds from the line of credit may be used to finance the acquisition of the sites for phases 2 through 6 of the Project.

"Project" is defined in the commitment letter as the "acquisition, development and construction, in six phases, of 112 units within POD 1-B of River Bridge to be known as The Landings."

4. The commitment letter recognizes that the partnership had an option to purchase Phases 2 through 6 pursuant to the Selected Builder's Agreement and that the partnership must exercise the option according to its terms. The commitment letter recites that as security for Phase 1 of the loan:

. . . at closing the Borrower shall give Bank a master mortgage which contemplates further spreader agreements (the Mortgage) whereby Bank shall receive a first lien on each site of each additional phase of the Project. . . The commitment letter defines the "land" as follows:

The legal description for the site of Phase 1 of the Project is described on attached Exhibit A. Sites for Phases 2 through 6 of the Project will by spreader agreement be impressed with a first lien as aforesaid.

5. The commitment letter contains a prohibition against secondary financing or subordinated mortgages affecting the project. Through continued negotiations between the Bank and the partnership, the financing prohibition was modified to allow for additional capitalization subordinate to the Bank's loan. Paragraph 41(h) of the commitment letter further provides that the borrower agrees it will not sell, encumber or transfer the land or improvements without the prior written consent of the Bank.

6. On April 25, 1986, the Bank and the partnership closed the $2,300,000 revolving construction loan. The Loan Agreement provided for the availability of acquisition and development funds for phases 2 through 6 as long as the Borrower was not in default and met the conditions precedent to disbursement.

176

The mechanism to spread the lien was spreader agreements based upon a use of proceeds for each phase assuming all conditions precedent to funding had been met.

7. The mortgage and security agreement executed April 25, 1986 by the partnership gave the Bank a first secured lien on Phase 1, the property then owned by The Landings Associates. The Revolving Credit Master Note was personally guaranteed by Jack M. Brolsma and Joyce J. Brolsma.

8. On June 4, 1987, the partnership exercised its option and purchase Phase 2 of the Project. Phase 2 consisted of the entire remainder of POD 1-B except certain lots. The partnership executed a mortgage spreader agreement and supplementary amendment to the loan agreement extending the Bank's lien to Phase 2. The Bank then funded all infrastructure improvements for the entire POD 1-B including roads, utilities, bulkheads and retainage pools, to permit development of the remaining lots.

9. On July 8, 1987, the partnership purchased Phase 3A of the Project consisting of Lots 71 through 82. The partnership executed a mortgage spreader agreement and a second supplementary amendment to the loan agreement extending the Bank's first lien to Phase 3A.

10. The partnership purchase Phase 3B on November 23, 1987 (Lots 87 through 92), and Phase 4 on December 29, 1987 (Lots 83 through 89, 93 through 94, and 101 through 106). The partners advanced the acquisition funds because they could not qualify for Bank funding.

11. Around June, 1988, the partnership realized that it would suffer significant losses unless the Bank loans were restructured. On August 31, 19888, Sanford Burns wrote to the Bank to renegotiate the loan. The Bank and the partnership attempted to restructure the debt to no avail.

12. On August 31, 1988, the partnership executed a mortgage in favor of Governor's Bank encumbering Phases 3B and 4 to secure a loan in the amount of $315,000. The Bank contends that it had no knowledge and did not consent to the mortgage.

13. On November 17, 1988, the accountant for the partnership, at the direction of Sanford Burns, wrote a letter to the Bank certifying that the partners had $900,000 invested in the Landings.

14. In December, 1988, the partnership booked the losses that they recognized in the summer of 1988.

15. In December, 1988, Elinor Kids Realty, Inc. was created at the

suggestion of Norman Belfer. The principals of Elinor Kids Realty, Inc. are Belfer's children. The corporation was created to lend money to the partnership so that the children, rather than a bank, would receive the interest paid by the partnership.

16. On December 9, 1988, the partnership purchased Phase 5 consisting of lots 95 through 100, 107 through 112, and 63 through 70. The lots were acquired by a $415,000 loan from Elinor Kids to the partnership; the loan was secured by a mortgage to Elinor Kids encumbering Phase 5.

17. On December 12, 1988, Elinor Kids purchased the $315,000 note and mortgage from Governor's Bank by assignment and advanced an additional $185,000.

18. On December 16, 1988, Elinor Kids advanced an additional $225,000.

19. By December 16, 1988, Elinor Kids had loan the partnership $1,140,000 and held a recorded mortgage on Phases 3B, 4, and 5. Funds above the purchase price were disbursed to Belfer and Burns.

20. Elinor Kids and the partnership were represented by Richard Zaretsky.

21. Norman Belfer and Sanford Burns testified that they contributed the money through their corporations to the partnership and that they personally received the proceeds disbursed to NEB and RMS including the funds from Governor's Bank and from Elinor Kids.

22. The Bank filed a six-count complaint to enforce the terms of the note (Count I), to enforce the personal guaranties (Count II), to foreclose the mortgage and security interest (Count III), for breach of contract (Count IV), for foreclosure of an equitable lien on Phases 3B, 4, and 5 (Count V), and to appoint a receiver (Count VI). Defendant NEB and RMS as general partners of The Landings Associates filed a counterclaim against the Bank. At trial, the defendants took a voluntary dismissal without prejudice on the counterclaim.

23. The parties have stipulated to the entry of a final judgment on Count I against NEB and RMS as general partners of The Landings Associates. The parties have agreed that the amount due without interest through August 22, 1990 is $1,983,651.75.

24. The Bank and Jack Brolsma and Joyce Brolsma, as guarantors on the note, have stipulated that $1,983,651.75 is due. The Brolsmas have introduced no evidence to support their affirmative defenses. The Bank did not release or discharge them from their obligation on the guarantee.

178

25. NEB, RMS, individually and as general partners of The Landings Associates, and Elinor Kids have stipulated that they have no defenses to the foreclosure action (Count III).

26. The Bank holds a lien for $1,983,651.75, plus prejudgment per diem interest of $896,755, superior to any claim or estate of the named defendants, except River Bridge Corporation, on the real property described in Exhibit "A" attached to this judgment, and in the Selected Builders Agreement.

27. River Bridge may claim an interest in the property subject to Florida National Bank's first secured record mortgage by virtue of the following instruments: the memorandum of option dated November 19, 1985 and recorded in Official Record Book 4716, Page 0555, Public Records of Palm Beach County; corrective memorandum of option dated March 31, 1986, recorded in Official Record Book 4846, Page 0958; memorandum of option - The Landings Phase 2 dated June 4, 1987, recorded in Official Record Book 5308, Page 0920; memorandum of option, The Landings Phase 3A dated July 8, 1987, recorded in Official Record Book 5349, Page 1899; subordination of option dated April 15, 1986, recorded in Official Record Book 4868, Page 1361; subordination of option, The Landings Phase 2 dated June 4, 1987, recorded in Official Record Book 5308, Page 0927; subordination of option - The Landings Phase 3A dated July 8, 1987, recorded in Official Record Book 5349, Page 1906, all in the Public Records of Palm Beach County, Florida. These interests of River Bridge Corporation are the only interests foreclosed by this action and are subordinate to the claim of the Bank.

28. In light of the judgment for the Bank on Count I and against the Bank on Count V, the court finds Count IV to be moot.

29. The Bank has withdrawn its request for a receiver in Count VI.

Most of the testimony and legal analysis in this case concerns Count V. The issues were thoroughly and brilliantly researched and litigated by counsel for the parties. The Bank has attempted to portray a nefarious scheme by the defendants that essentially defrauded the Bank of its security interest and repaid the defendants for their lost capital. In reality, the Bank has security for the money invested in the project, and never asked for additional security at any time. The fact that the principals have been able to salvage a portion of their investment from property unencumbered by Bank liens does not make them scoundrels.

On Count V seeking the imposition of an equitable lien, the court makes the following findings:

179

■

1. The loan agreement constitutes the final agreement between the Bank and the partnership, and sets forth the terms and conditions of the agreement and the rights and responsibilities of the parties.

2. The original mortgage encumbers only Phase 1, the only land owned by the partnership at the time of execution of the loan agreement.

3. The project was planned as a phased project. The Bank provided construction funds for Phase 1, and would later provide acquisition funds for each additional phase. After each phase was purchased the Bank would provide construction funds for the units in that particular phase. The partnership was obligated to purchased the additional phases on schedule from River Bridge. The Bank was aware of the option schedule and, in fact, had an assignment of the agreement.

4. In October, 1987, Jack Brolsma advised the Bank that River Bridge was demanding that the partnership purchase Phase 3B under the option schedule. The Bank refused to provide the acquisition funding to purchase Phase 3B. The partnership had to obtain funds from outside sources, therefore, to purchase Phase 3B. The Bank never requested that its mortgage be spread to Phase 3B as was done in Phases 2 and 3A when it had advanced the acquisition funds.

5. On December 29, 1987, River Bridge again demanded that the partnership purchase Phase 4 under the terms of the option agreement. Again the partnership used outside sources to purchase Phase 4. The Bank never requested to spread its mortgage to Phase 4.

6. On May 3, 1988, the Bank and the partnership entered into a Mortgage Extension and Note Modification that extended the maturity date of the loan to April 25, 1989.

7. At no time from June 1988 to the initiation of litigation did the Bank demand that the partnership spread its mortgage over Phases 3B and 4, nor did the Bank assert that it had a right to a lien.

8. On August 31, 1988, the partnership borrowed $315,000 from Governors Bank secured by a mortgage on Phases 3B and 4. Approximately $100,000 of the loan was repaid to the partners for acquisition costs of 3B and 4 and the remaining funds were invested in the project.

9. In August 1988, Sanford Burns advised the Bank that the project was having serious financial problems; he advised the Bank that it was under-collateralized and that the project was headed for disaster. Burns told the Bank that the original investors were considering abandoning the project and requested restructure of the loan.

10. The parties were unable to agree to restructure the mortgage. At

180

no time did the Bank request that its mortgage be spread to Phases 3B and 4, or assert that it had a lien to a lien on 3B and 4.

11. On December 9, 1988, Elinor Kids loaned the partnership $415,000 secured by a mortgage on Phase 5 that was purchased according to the option schedule with River Bridge. Elinor Kids purchased the note held by Governors Bank and was assigned the Governors Bank mortgage. The mortgage of Elinor Kids encumbers Phases 3B, 4, and 5.

12. The Bank was aware of the existence of the Elinor Kids mortgage prior to the time that it declared a default. At no time did the Bank demand that the mortgage be removed from the property or that its lien be spread to the additional phases.

13. NEB and RMS have invested over $1,100,000 into the project in addition to the liability to the Bank for $1,983,651.75 and the liability to Elinor Kids for $1,145,000. It should be noted that between July 1987 and the date of default, the partnership reduced the balance of the loan by one million dollars, atypical of a machination to fleece the bank.

14. Under FLorida law, an equitable lien may be imposed upon real property in two circumstances. Under the first situation, an equitable lien may be imposed where there exists a written agreement that evidences an intention on behalf of the parties to impress a particular parcel with a particular debt. *Manatee Federal Savings & Loan Association v Pace,* 378 So.2d 95 (Fla. 2d DCA 1979); *Hansen v Five Points Guaranty Bank,* 362 So.2d 962 (Fla. 1st DCA 1978). In the second situation, an equitable lien may be imposed as the result of unjust enrichment of the party against whom the lien is sought. *Merritt v Unkefer,* 223 So.2d 723 (Fla. 1969).

15. The written documents do not demonstrate a clear intent on the part of the partnership to lien land purchased without Bank funds. The loan agreement specifically states:

> The parties to this Agreement envision that with each subsequent phase beginning with Phase 2, an initial acquisition advance shall be made by bank for land costs and that this advance will be made upon a closing where the lien of the mortgage shall be spread to cover the additional real property.

Paragraph 5(a) of the loan agreement further provides:

> All land acquisition costs and loan closing costs relating to the spreading of the Mortgage shall be disbursed at the time of closing each phase.

**181**

The collateral securing the loan was "the real property encumbered by the Mortgage and all land added to the lien by spreading agreements hereafter executed by Borrower." Each provision of the loan agreement which deals with the security for the loan or the mechanism for establishing that security is predicated upon the Bank providing the acquisition funds and the borrowers executing a spreader agreement extending the lien to the land purchased with the Bank's money.

16. Steven Skakandy testified that the loan documents did not contemplate the borrower securing funding for the acquisition of Phases 3B, 4 and 5 from sources other than the Bank and, therefore, did not cover this situation. Lowell Bower testified that the right to a spreader agreement was implied only if the Bank provided acquisition funds. The collateral securing the loan is defined in the loan agreement as all real property added to the lien by spreading agreements. The court cannot find that there was a clear intention on behalf of The Landings as expressed in the documents to charge the land in Phases 3B, 4 and 5 with the debt to the Bank.

17. Each spreading agreement was executed after the Bank had advanced the acquisition funds. The commitment letter provides that the Bank's lien will be spread to each site and the realty ". . . as additional advancements and disbursements occur." When viewed as a whole, the common element in the commitment letter and loan agreement is that the Bank's lien would be spread only when the Bank provided acquisition funds. It is additional evidence of the parties' intention that the Bank did not declare a default after learning of the purchase of Phases 3B, 4, and 5.

18. The court finds that the requirements of *Merritt, supra,* for the imposition of an equitable lien have not been proven. Under *Merritt,* the Bank must prove the existence of a material misrepresentation in good faith to its detriment, and that the Bank is without an adequate remedy of law. *Phillips Petroleum Co. v Schun Co.,* 222 So.2d 491 (Fla. 4th DCA 1979); *Chase Manhattan Bank v S/D Enterprises, Inc.,* 353 So.2d 131 (Fla. 3d DCA 1977); *Architectonics, Inc. v Salem-American Ventures, Inc.,* 350 So.2d 581 (Fla. 2d DCA 1977); *Buffalo Tank Corp. v Environmental Control Equipment, Inc.,* 544 So.2d 1037 (Fla. 2d DCA 1989).

19. The Bank alleges that the funding and subsequent mortgages to Governors Bank and to Elinor Kids constitute material misrepresentations. Since the loan documents were never intended to apply to the acquisition of land with funds from other sources, these acts by the partnership do not constitute misrepresentations. Even if use of outside

182

funding sources somehow constituted a breach of the loan agreement, the Bank has shown no detrimental reliance. In fact, from the time that the partnership used outside funds, the debt to the Bank was reduced by $1,000,000 and the partnership infused an additional $500,000 capital into the project. The Bank did not advance any funds for acquisition after the partnership acquired Phases 3B, 4, and 5.

20. The Bank has an adequate remedy at law. It will obtain a judgment for the full amount of its principal, interest and costs, and can execute on that judgment on all property owned by the partnership. The test of inadequacy of remedy at law is whether a judgment can be obtained, not whether, once obtained, it will be collectible. *Mary Dee's, Inc. v Tartamella,* 492 So.2d 815 (Fla. 4th DCA 1986).

21. To provide the Bank with an equitable lien under the facts and circumstances of this case would be inequitable to the partnership. The Bank seeks a lien in fairness and equity when it knew of the subsequent purchases of Phases 3B, 4, and 5, failed to ever assert its lien rights as the purchases were made, and did nothing to protect those alleged rights. The partnership contends that it was lulled into borrowing money from Governors and Elinor Kids by the Bank's silence concerning its alleged lien rights. The partnership argues that inequitable conduct on the part of the Bank prohibits it from now seeking equity from the court.

22. The Bank argues that it is entitled to an equitable lien because it provided funds for the installation of an infrastructure that gives some benefit to Phase 3B, 4 and 5. There is no evidence of how much the infrastructure improvements benefits the land in Phases 3B, 4, and 5. The use of proceeds from Phase 2 identifies the cost of the infrastructure improvements to Phases 2, 3A, 3B, 4 and 5 without further specification. In consideration for providing the funds for infrastructure improvements, the Bank requested and received a mortgage covering all the common elements. The Bank got precisely what it bargained for with respect to the infrastructure improvements.

23. The court finds for the defendants and against the Bank on the claim for an equitable lien. Judgment is entered in favor of defendants and against plaintiff on Count V.

It is hereby ORDERED AND ADJUDGED as follows:

1. Florida National Bank shall recover $1,983.651.75 plus prejudgment interest from August 23, 1990 of $25,109.14 plus post-judgment interest of 12% per annum from NEB of WPB No. 1, Inc., RMS River Bridge No. 1, Inc. in their capacities as general partners of The Landing Associates, and The Landings Associates, a Florida general

**183**

partnership, for all of which let execution issue. The court reserves jurisdiction to award attorney's fees and costs on Count I.

2. Florida National Bank shall recover from Jack Brolsma and Joyce Brolsma, jointly and severally, $1,983.651.75 plus prejudgment interest from August 23, 1990 of $25,109.14 plus post-judgment interest at 12% per annum for all of which let execution issue. The court reserves jurisdiction to award attorney's fees and costs on Count II.

3. Florida National Bank holds a lien for the total sum of $2,008,760.85 superior in right and title to the claims of all defendants in this action on the land known as Phases 1, 2, and 3A described in Exhibit A attached.

A. If the total sum of $2,008,760.85 with interest at the rate prescribed by law and all costs of this action accruing subsequent to this judgment are not paid within thirty days from this date, the Clerk of Court shall sell the property at public sale on the 19th day of November, 1990, at 11:00 o'clock a.m. at the southwest corner, first floor lobby, 300 North Dixie Highway, Palm Beach County Courthouse, West Palm Beach, Florida to the highest bidder for cash or for the amount of the judgment herein, in accordance with Section 45.031, Florida Statutes, the following property:

See attached Exhibit A, Phase 1, 2, and 3A

Lots 71-78 inclusive and Lots 80-82, Replate of THE LANDINGS AT RIVER BRIDGE, recorded at Plat Book 55, Page 75, Public Records of Palm Beach County, Florida.

B. Plaintiff shall advance all subsequent costs of this action and shall be reimbursed for them by the Clerk if the plaintiff is not the purchaser of the property at the sale. If the plaintiff is not the purchaser, the Clerk shall credit plaintiff's bid with the total sum, with interest and costs accruing subsequent to this judgment or such part of it as is necessary to pay the bid in full. On filing the Certificate of Title, the Clerk shall distribute the proceeds of the sale as far as they are sufficient by paying:

First:   all of plaintiff's costs;

Second: documentary stamps affixed to the Certificate;

Third:   plaintiff's attorneys' fees;

Fourth: the total sum due plaintiff less the items paid, plus interest at the rate prescribed by law, from this date to the date of the sale, and by retaining any amount remaining pending further order of this court.

184

C. On filing the Certificate of Title, all defendants excluding River Bridge and all persons claiming under or against them since the filing of the Notice of Lis Pendens are foreclosed of all estate or claim in the property to the extent set forth herein, and the purchaser at the sale shall be let into possession of the property by the Clerk of the Court.

D. As to River Bridge, the only interests foreclosed by this judgment and subordinate to the Bank's claim are listed in #27, p. 8-9 of this judgment.

4. On Count IV and Count V, Florida National Bank shall recover nothing from the defendants and the defendants shall go forth hence without day.

5. The court reserves jurisdiction to award costs and fees, writs of assistance and deficiency judgments, and to enter any further orders necessary and appropriate.

DONE AND ORDERED this 18th day of September, 1990 in chambers at West Palm Beach, Palm Beach County, Florida.